Samuel Kornhauser for the appellant, Navellier & Associates, and Lewis Navellier. I'd like to reserve five minutes for rebuttal. You may. Thank you. This case is a supposed violation of Section 206.1 and 206.2 of the Investment Advisors Act. We're here and believe that the case, the summary judgment, basically should be reversed because the SEC never proved their case. They never proved any fraud. In fact, they basically said they didn't even contest that the two alleged statements that they say violated Section 206, they didn't contest that the statements were false. What they said, what the SEC said, was that we didn't have any evidence to support those statements. That's absolutely untrue. The statements were true. The statement that – Are you saying it's true that the investment strategy was live tested from 01 to OA? Not Navellier's. There were a number of mischaracterizations. Navellier's VERIO strategy, and I hope we can make that clear, the strategy that my clients had was called VERIO, Alpha Sector Strategy. There were two of them. We never said that that was live tested or live traded going back to 2001. But that wasn't my question. My question was, are you saying it was true that it was live tested? No, I'm saying that it's true. So any statement that it was live tested would have been false? That's right. So what you're actually saying then is your client never said it was live tested. That's right.  So, counsel, when the SEC says, and this is reflected in the findings of the district court, that there was marketing material from your client that explicitly said that this strategy was supported by live testing, that's simply not true? The record will reflect that your client never explicitly referred to live testing in that period beginning in 2001? From 2001 to 2008, my client never said that it was live traded. Live trading started in 2010. I defy the SEC to show any evidence that there's any marketing material where Navalier & Associates said that its VERIO strategy, which is what it was marketing, was live traded prior to 2010. What about the brochure, the brochure that your client used, that said live assets began tracking the strategies, live track record for U.S. equity sleeves stress-tested across two bear markets? Yeah, that's a reference to a strategy. You had Navalier & Associates' VERIO strategy. That was based on F squared's alpha sector index. That was an index strategy, and that F squared index strategy was loosely based on some unnamed investment advisor. It turns out it's this guy, Jay Morton, who had a strategy that he did live trade in 2001. But we never said that our strategy, VERIO's strategy, was live traded until 2010. It was very clear. I'd ask your honors to take a look at 11 JA2908 through 2909. We made clear that what we're talking about is the VERIO strategy that began live trading in 2010. So I'm confused, then, again, looking at your brochure. There's a chart on it that says alpha sector allocator premium index performance April 2001 to June 2011, and then it's got a graph for all those years of how it did. And that's the index, your honor, and that's F squared's strategy. Was that live tested? No, and we never said that it was live tested or live traded. Performance sounds like it performed. Well, at least in the securities industry, you can, and the SEC even permits it with this no action letter, a Clover letter that we cited to your honor. An investment advisor can provide hypothetical performance for an index going back prior to the time the strategy was in place. If certain requirements are made specifically that you identify that it's a hypothetical performance, that it's not real. We made that abundantly clear. If you take a look at Navalier's disclosures, their marketing material, they have a separate section. It's at 12 Joint Appendix 2994, key document. That shows that there's a disclosure that any index performance is not real money that was real traded. And then they've got another chart. If you take a look a couple pages before, it shows that Navalier's actual live traded VREO strategy began in 2010. And it's got the graph of what happened and compares it to the Dow. And it talks about Navalier's strategy, VREO strategy, that it was marketing, that it was based on F squared's index strategy, not any live traded strategy, that it was based on its index strategy. Counsel, what about you have all these internal emails sent by Mr. Navalier to his clients, an investment strategy, which is based on live trading, and his awareness that in making those representations it was based on live trading. That was fraud. I mean, he uses the very word. So he seems to reflect an awareness that they have been engaged in the very marketing strategy, which you say the company did. Right. Mr. Navalier is pretty flamboyant. He's a little unconventional in his management style. If you take a look at it, if you take a look at his testimony, not these internal emails that he sent, he was doing that. And if you take a look at the context of those emails, I ask that you do that, you can see that what he was trying to do was get his marketers, that are spending 95% of their time marketing this VREO strategy, that he couldn't stand. He didn't like it because it was a defensive strategy. He'd had 35 years of building a reputation as an aggressive growth manager, meaning that he could beat the market. He wasn't an index guy. But it was after the crash. You seem to be saying that by having your client repudiate his very explicit acknowledgement of this fraudulent conduct, that that somehow generates, for purposes of summary judgment, a genuine issue of material fact. That sounds to me like the kind of very improbable inference that you'd be asking a jury to draw. That summary judgment doesn't count. He testified to that. If you look at the emails, that's exactly what we're saying. Those weren't admissions that it was fraud or that he thought it was fraud. He was trying to intimidate his people to quit marketing VREO and mark the core strategies that he had. He testified to that under oath, those emails. And if you take a look at the context, then he's railing after he says, oh, this is a fraud. And he says, if our marketers keep selling VREO, then they can get other jobs. He wanted them. Those were strategies that he developed. He had core strategies. He had aggressive growth strategies. He built a pretty good reputation as being an aggressive growth. I'm sorry. I guess I'm – Let me ask you one more question. Sure. I'm going back to the beginning of the case. I'm going back to the complaint and the answer. In your answer in paragraph 5, your client says it lacked knowledge or information to admit or deny whether claims about virus sectors performed were true. Isn't that so? Well, actually, that is. And if you really look at our answer to 5, it says that we deny those allegations, that we didn't have support for that. And – Well, it says you deny it because you don't know whether it's true or not. You can't admit or deny. You say you can't admit or deny. But you're allowed to – even if we said that we weren't aware. That was in the beginning of the case. That's on me and actually the prior attorneys that filed the answer. But we submitted substantial evidence that we did know that it was not – that that strategy by Morton, the tertiary guy, the original inventor of that strategy, that he was live trading it. And Morton submitted evidence and admissions that he was live trading. And NASDAQ, OMX, that we relied on, confirmed that it was live traded. And they submitted spreadsheets of the live trading going back to 2001. Thank you, Mr. Kornhauser. My colleagues have any questions? You have five minutes for rebuttal. Thank you. Thank you. Will Attorney Alvarez please come up and introduce yourself for the record? Thank you, Your Honors. Good morning. Paul Alvarez for the Securities and Exchange Commission. Your Honors, Investment Advisors Act Section 206 imposes federal fiduciary standards on the conduct of investment advisors like the appellants here. And as such, the appellants owe affirmative fiduciary duties to their clients and prospective clients of utmost good faith, full and fair disclosure of all material facts, affirmative duties of care, of loyalty, of always acting in the best interests of their clients, and they have an affirmative duty to employ reasonable care to avoid misleading their clients. As Your Honors' questions highlighted, the undisputed facts in this case show that the appellants repeatedly and in various ways breached those affirmative fiduciary duties to their clients in connection with the offer and sale of the Vero Alpha Sector products. And in light of the undisputed evidence, the district court's summary judgment on the 206-1 and 206-2 claims should be affirmed. The district court also acted within its reasonable discretion in ordering remedies. But before I get to the remedies, I'd like to point out a couple of problems. Number one, my friend on the other side said that there is no evidence that the appellants said that things were live traded. But as Your Honors pointed out, and I'll highlight pages 10 and 11 in our brief, there are numerous examples where they did say that. I'd also like to point out 11 Joint Appendix 2867 through 2959, 12 JA 2976, 2964, 2945, 2933, 3018, and 3019. In each of those places, the appellants stated that the performance was based, quote, on an active strategy with an April 1, 2001, inception date. They talked about live track records, stress tested across two bear markets. There is no question that they stated that these were live traded. Excuse me, when the SEC brought to the attention of the company, I guess on three occasions before you actually commenced the enforcement action, in giving those warnings to the company, did you bring to their attention the very marketing material that gave the SEC concern that included those representations about live trading? So, on the three prior occasions where the SEC's Division of Examinations spoke with Mr. Navalier and his firm about this issue, it was about investment vehicles that were not the verial alpha sector investment vehicles. They were about separate investment vehicles. But in each of those instances, they admonished Mr. Navalier and his firm that they needed to accurately represent when things were hypothetical or when things were live traded. And the reason is because when you're backtesting something, you have the benefit of hindsight. You have the ability to take a strategy and use different variables and change things because you know what's already happened, and so you can sort of backfill in and then move forward. But when you're in the real moment now and you don't have the benefit of the hindsight, you may not make those decisions that you would make when you do have the benefit of hindsight. That's why the SEC made it very clear that they needed to be honest and upfront about their advertisements. They needed especially with regard to whether things were hypothetical or backtested. And while my friend has spoken about, there were a couple of instances where they said, yes, this is hypothetical. In those same advertisements, they also state that it is based on an active strategy with an April 1, 2001 inception, and that they talk about live trading, even in spite of stating that there are hypothetical situations. But that, again, those advertisements occurred much, much later towards the end of 2012, and they began marketing these vehicles in 2010. And so for two years plus, they were, without fail, stating that these were live traded. And as a result, they were materially misleading clients and prospective clients. There's an argument made that based on the testimony of one investment advisor, I think his name was Zanoni or something like that, and based on the testimony of an SEC lawyer, a jury could have found that the statement that it was live tested was either immaterial or was of disintegrating materiality as time went by. And so that should have gone to a jury. I understand the argument being made. Well, I think it's a question of whether a reasonable investor would have concluded that this would have affected their decision. And I think that given the fact that they repeatedly stated, I mean, you have to understand, too, the context of this statement is they're arguing that we are giving you an investment product that is based on a strategy that has survived the dot-com bubble burst and the Great Recession. And not only did it do that, not hypothetically, it did it based on live trades. The person who came up with this strategy did it successfully without any benefit of hindsight at all. That type of statement, even if you include that Mr. Zanoni or whatever his name is, the significance of that statement is so obvious to a reasonable investor that that would be material. But you mentioned reasonable investors. Shouldn't that be a jury issue? Oftentimes that is, Your Honor. Why isn't it here then? Simply because of the nature of the claims that are being made, right? I mean, as I said, this is the kind of statement where you're going to the purpose of what the investors are trying to accomplish with this investment. Do you have examples of any other cases in which a court has found as a matter of law a statement is material? Yes. Absolutely, yeah. I believe we included those in our brief. But, for example, there's TSC Industries, the Supreme Court case where it says that you absolutely may do that. And SDC v. Mayhew. Yeah, we've cited a number of those in our brief at page 33 and 34. But this court has held, I'm trying to remember, I think even in the Johnston case where this court talked about materiality as a matter of law, where the facts are so obviously demonstrate materiality that this court can't decide it. And while that is ordinarily a jury issue, I think given the undisputed facts here, particularly given the fact that you also have to look to Mr. Navalier's e-mails, Mr. Navalier's conduct with regard to all of this, not only did he state that Mr. Present was engaged in perpetuating a 10-year fraud on the basis of these very past performance claims, but then they sought to offload the Vero Alpha Sector business to avoid liability. And those actions demonstrate that this was obviously a material misstatement that was being made. And that the fact that they lacked evidence to support those claims created a risk of misleading. So those cases you just cited us to, in your brief, they're not on this point. They're cited for the proposition that the government doesn't need to prove actual reliance. But the issue here is materiality. So again, I go back to my question. Are you saying that those cases that you refer us to on the issue of reliance, although your brief doesn't say it, also address materiality? No, Your Honor, what I'm saying is I'm blanking on the various cases where this court has said that it may decide materiality as a matter of law. But I know that this court has said that, and I'm blanking on the cases right now, so I apologize. I'm happy to submit something to Your Honor if that's okay. But I know that this court has held, and other courts also have held, that where the evidence is strong, as it is here, that materiality may be decided as a matter of law. Counsel, when Nivellier sold this portfolio of clients, as I understand it, to F2, however you say it, I assume that the clients that were included in that portfolio were advised that this transfer was taking place, and they would have the option of taking their business elsewhere. Is that correct?  And so my question, if they were advised, did Nivellier indicate to them that this company had been using this investment strategy that was supposedly based on live trading when it was not? I mean, I ask that because, as I understand it, that sale was preceded by Mr. Nivellier's acknowledgement that that's what had been happening, and that's one of the reasons they wanted to go forward with this sale. But that acknowledgement, I doubt it, was never made to the clients. Is that correct? That's correct, and I think it's critical to point out, Your Honor, that the sale price that Mr. Nivellier and his firm received was dependent upon the number of clients that remained with Nivellier and Associates at the time of the sale. So if clients had been leaving, that number would have dropped. So it behooved Mr. Nivellier and his firm to keep those clients on board, and that's why when you look at that letter, he states nothing about the reasons that he had explained internally why he wanted to get rid of the business, that he thought it was a fraud and that he was just going to offload it so they could have a big payday. He said nothing about that to the clients to give them an opportunity, but rather said exactly the opposite. The only material change for you will be the name on the top of your monthly statement. And that not only shows, that's not only misleading, I mean, that just shows a betrayal of his duty of loyalty to those clients to give them a meaningful opportunity to make that change. And he chose to line his own pockets and not to tell his clients the truth, either about the material misrepresentations that he had made, or about the underlying reasons for why he was selling the business. Counsel, let me ask you the same question I asked opposing counsel. In the answer, going back to the beginning of the case, the response is in paragraph five, that the defendant lacked knowledge or information to admit or deny the claims about the virus sector's performance. Opposing counsel said that doesn't affect anything. That was prior counsel who answered that, but do you think that carries any weight or should not be given any weight? Absolutely. I think that does carry weight. I think it's also consistent with the evidence in this case. To the benefit of the SEC? Yes, I think the evidence points in one direction only. And the answer is, in your view, consistent with that evidence? Correct. Advisors have a duty of care that they have to make sure that there's a reasonable belief that the investment is in the client's best interest. In order to do that, they must investigate to ensure that their advice on whatever investment vehicle they are recommending is not based on incomplete or inaccurate information. But Mr. Navalier, by admitting not only in his answer, but in every other aspect of this case, and if you look at the e-mails, and you look at Mr. Knapp saying, they flat out won't show the math to us. We don't know whether this was live traded. We can't rely on the claims that this was live traded because we don't have any proof. They didn't know one way or the other, and yet they recommended it as if it was definitively live traded. That is a betrayal of the duty of care to their clients. So the answer to paragraph five is consistent with all of that evidence, and it points only in the direction of the SEC's claim. And in a sense, that answer, in your view, I assume it would be like an admission. Yes. Well, yes, it is. It is an admission. Absolutely. But then you also look to Mr. Navalier's admissions in his e-mails. And I understand his explanation, which, as Judge Lippez said, it is, I want to get this right, you said that it was an improbable inference, and I think that's absolutely correct. It certainly doesn't create an issue. Well, I didn't say it was improbable, but the suggestion was that it might be, in the Court's view, so improbable that it does not generate a genuine issue of material fact. Well, in the Commission's view, it is, and it's so improbable that it does not create a genuine issue of material fact. May I ask you, just quickly, I am troubled by, it's a secondary issue in the case, I understand, but this attorney-client privilege argument, I'd like to just spend a moment on that. As I understand it, counsel for Navalier retained a company in the wake, in the fact, given that the SEC was going to be proceeding with this enforcement action to evaluate how the company had complied with the applicable SEC rules, gave them a report, gave the attorney a report on this issue of compliance, that would then allow the attorney to advise his client about this issue of compliance. Why isn't that third-party effort requested by counsel in order to give advice to his client, why isn't that classically covered by the attorney-client privilege? And yet the Court allowed discovery of that, and then the Court actually used that report in its decision against Navalier. Why isn't there a breach of the attorney-client privilege there? So there's a few answers to that, Your Honor. The first is, I'd like to point this Court's attention to the consulting agreement that Navalier & Associates engaged ACA, and that's at 5JA 1264, and it is a consulting agreement. And in that consulting agreement, it expressly states, and this is at 5JA 1267, that ACA does not offer legal or accounting services, nor does it provide substitute services for those provided by the counsel. So what? They're not giving a legal opinion, but they are giving the lawyer the results of their compliance review. Well, I think it's important to distinguish between compliance review and review in terms of whether they're defending something. You have to also keep in mind the timing of this. ACA was retained nine months before the Commission began investigating F squared. Navalier & Associates was nowhere near the Commission's view of bringing an action against them. This was not in anticipation of litigation, and just simply saying, well, I've retained this person because at some point down the line, I think I might get sued, that's not enough. It has to be for imminent litigation, and that's just simply not the case here. It was nine months before F squared was, the investigation into F squared began, and it was years before the Commission instituted its investigation into Navalier & Associates. So I think you take the timing into account. You look at the fact that this was simply a compliance review by ACA to try and shore up their advertisements moving forward, not in anticipation of litigation, because they simply had no basis to conclude that there was going to be litigation against them at that point.  Thank you, Your Honor. I'd reserve five minutes. Can you please reintroduce yourself for the record? Oh, I'm sorry. Samuel Kornhauser for the appellants. Your Honors, this whole case is built on a house of cards. These are all accusations that Navalier said that their strategy was live traded. I'm pleading with you to take a look at the evidence. They can't show you a single document or marketing piece that said that Navalier's Vireo strategy was live traded going back to 2001. I'd ask you to take a look at 12 JA 2994. Prominent disclosure. There's no real money being traded. This is hypothetical performance. The performance record that's being talked about on the index isn't Navalier's index performance. It's Alpha Sector. It's F Squared's performance. And it's an index performance. It's hypothetical. Didn't your client repeatedly refer to the F Squared people as fraudsters? Louis Navalier called Howard President a fraudster when he was trying to scare his people into not marketing. He had a business. Before F Squared came along, before they did this defensive strategy, there was 100% aggressive growth. That means that they tried to find the best securities to invest in that would beat the market. And now F Squared comes along after the crash and they say we've got a defensive strategy. What do you mean that he tried to scare them into not doing it? He's the head of the company. Why couldn't he just put an end to it? Because he didn't want a mutiny on his hands. These are all his marketers that have been there for years and years. They're out there. They're not selling an aggressive strategy after the stock market crash. So he's trying to keep them and he's trying to say, look, quit selling this, start selling our core strategies. And eventually he did. That's why he sold it. These are all jury issues, by the way. Navalier sold the business. They were making a ton of money. Why would he get rid of that? Because he says it's fraud. That's why he would get rid of it. He started saying it was fraud in 2011. They sold it in 2013. And this whole supposedly fraudulent thing about live trading, they dropped that out of their marketing material in 2011. And what happened? Was it really material? Why did they drop it out? Because Navalier wanted it out. He wanted them to start pushing the... When they dropped it out, they knew it wasn't true. They knew there was no backup for it, didn't they? No, they had absolute backup. NASDAQ, the gold standard, said that it was live traded. They're the ones that calculated the index performance. And they had gotten that information from Jay Morton, who had actually live traded it back in 2001. He presented them with evidence. If you take a look at 3JA, the 600, the 609, and especially 606, you can see that Jay Morton is giving them evidence that it was live traded. But Navalier's strategy wasn't. I'd ask your honors to really take a look at the material, what was said. And what Louis Navalier's accusations are not evidence. Navalier admitted that he had no proof that F squared was a fraud. I mean, take a look at it. I mean, anybody can make an accusation. I'll date myself that there's a famous songstress, Adele. She's got a song called Rumor Has It. And in that song, I think it sums up this case. Just because I said it doesn't mean I meant it. And that's what Navalier's emails were. He's trying to get his people to not revolt and to quit selling F squared. It just makes no sense. If Navalier really thought it was a fraud, he wouldn't have allowed this to keep going on. Anyway, I'd ask you to take a look at it. It's disclosed clear as a bell that the F squared index strategy is not real money for real people. You've got to look at, I'm pleading with you, look at the evidence. Not what the SEC says Navalier's people said, but look at the material. What did it really say? And with regard to materiality. Excuse me, are there any further questions?